UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLES K. HUDSON, | ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | )    Civil Action No. 15-cv-1988 (TSC) <br> ) |
| RYAN ZINKE, *et al.*, | ) <br> ) |
| Defendants. | ) <br> ) |

## MEMORANDUM OPINION

Plaintiff Charles Hudson, an enrolled member of the Three Affiliated Tribes of Fort Berthold Reservation in North Dakota ("Three Affiliated Tribes" or "Tribe"), brings this Administrative Procedure Act ("APA") suit against the entities responsible for conducting Secretarial elections for the Tribe: the Department of the Interior ("DOI"), Secretary Ryan Zinke, and Acting Assistant Secretary Michael Black (collectively "the Department"). Hudson challenges the Department's approval of a July 30, 2013 Secretarial election (the "2013 Election"), which amended the Three Affiliated Tribes' Constitution (the "Tribal Constitution"). He claims that because an insufficient number of voters participated, the election lacked the requisite 30% quorum under the Tribal Constitution and the Indian Reorganization Act, 25 U.S.C. § 5123. He also claims that the Department sent misleading voting information to tribal members, which discouraged off-reservation voting.

Both Hudson and the Department have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF Nos. 35 and 37.) Having reviewed the parties' filings and the record, and for reasons set forth below, the court will GRANT Hudson's motion for summary judgment and DENY Defendants' motion for summary judgment.

## I. BACKGROUND

A. <u>**Indian Reorganization Act**</u>

Hudson's claims are governed by the statutory and regulatory framework of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5123. The Act encourages self-government by providing a mechanism for tribes to adopt constitutions, which must be ratified by a majority vote of the tribe's adult members at a special election before going into effect. 25 U.S.C. § 5123(a)(1). The Act, and its accompanying regulations, also set out the procedures for a tribe to amend its constitution through Secretarial elections. These elections are "federal—not tribal," *Thomas v. United States*, 189 F.3d 662, 667 (7th Cir. 1999), so a tribe must ask the Secretary of the Interior to call and conduct them. 25 U.S.C. § 5123(c). Once the Secretary receives a qualifying request for a Secretarial election to ratify proposed constitutional amendments, the Secretary must call and hold an election within 90 days. 25 U.S.C. § 5123(c)(1)(B).

For an amendment to be ratified, the IRA requires both a majority vote in favor and a quorum of voters participating in the election. 25 U.S.C. § 5127. The quorum requirement provides that "the total vote cast shall not be less than 30 per centum of those *entitled* to vote." 25 U.S.C. § 5127 (emphasis added). The 1964 regulations defined a tribe member "entitled to vote" as "any adult member regardless of residence." 29 Fed. Reg. 14,359, 14,360 (Oct. 17, 1964). In 1967, the Department amended the regulation to provide for registration, and re-defined "entitled to vote" as "only voters who are duly registered." 32 Fed. Reg. 11,777, 11,778 (Aug. 16, 1967) (codified at 25 C.F.R. § 52.6(c)). In 1981, the Department again amended its regulations, to reiterate the definition of "entitled" in a new section called "registration," which provided that "[o]nly registered voters will be entitled to vote, and all determinations of the

sufficiency of the number of ballots cast will be based upon the number of registered voters." 46 Fed. Reg. 1,672 (Jan. 7, 19781), codified at 25 C.F.R. § 52.11.[1]

Election results are not finalized until they are approved by the Secretary, 25 U.S.C. § 5123(d), and certified by the tribe's Election Board, 25 CFR § 81.41 (2015). Any qualified voter can contest election results within three days of the results of the election by submitting "the grounds for the challenge, together with substantiating evidence." 25 C.F.R. § 81.22 (1985). The Secretary has 45 days to resolve election contests, conduct an independent review and approve or disapprove the election, but the scope of review is limited to ensuring the amendments comply with applicable federal law. *See* 25 U.S.C. § 5123(d).

### B. Three Affiliated Tribes' Constitution and Amendments

In 1870, the federal government established the Fort Berthold Indian Reservation in the Missouri River basin for the region's "Three Affiliated Tribes": the Mandan, Hidatsa, and Arikara Nations. After voting for recognition under the IRA, on May 15, 1936, the Tribes adopted their Constitution "by a vote of 366 for, 220 against . . . [i]n an election in which over 30 percent of those entitled to vote cast their ballots, in accordance with section 16 of the [IRA]." (ECF No. 43 (Administrative Record ("A.R.")) at 91.) Because over 30 percent of the adult membership voted, and a majority of those voting approved, the Tribal Constitution was ratified pursuant to the IRA. (*Id.*) On June 29, 1936, the Secretary of the Interior approved the Tribal Constitution under Section 16 of the IRA. (*Id.*) Like the IRA, the Tribal Constitution requires both a majority and a quorum for a Secretarial election to amend the Constitution. Tribal

---

[1] The part 52 regulations were subsequently redesignated as 25 C.F.R. Part 81. Redesignation Table for Chapter I Title 25—Indians, 47 Fed. Reg. 13,327 (Mar. 30, 1982). Since the 2013 Election, the Department has amended the regulations at issue; however, the 1981 regulations were operative during the election in this case. (ECF No. 38 ("Def. Br.") at n.4–5.)

Constitution, art. X. The Tribal Constitution's quorum requirement requires that: "at least thirty (30) percent of those *entitled* to vote shall vote in such election . . . ." *Id.* (emphasis added).

The Three Affiliated Tribes held two Secretarial elections to amend its Constitution before the 1967 regulations implementing the registration requirement. On July 20, 1955, a majority voted in favor of an amendment; but the amendment failed because it lacked the necessary 30% quorum. (A.R. at 107.) The election results report, signed by the Chairman and Secretary of the Tribal Business Council and by the Bureau of Indian Affairs ("BIA") Agency Superintendent, stated "that 281 votes does not constitute 30% of those entitled to cast their ballots in accordance with Section 16 of the [IRA]." (*Id.*) A year later, the Tribe held a Secretarial election to amend the Constitution to permit absentee voting in Secretarial elections. (*Id.* at 105–06.) This amendment was proposed because of concerns that prohibiting absentee voting made it difficult to reach the required 30 percent quorum in Secretarial elections. (*Id.*) The record does not contain documentation of the outcome of that Secretarial election or whether it met the quorum requirement, but the Constitution reflects that an amendment passed in 1956. (*See* Tribal Constitution, art. IV, § 2(a) ("This section amended by Amendment No. 1, effective October 16, 1956 . . ."); *see also* A.R. at 82.)

Since the BIA implemented the registration requirement, the Department has conducted and approved six more Secretarial elections before the one challenged here:

- In a 1974 election, 426 tribe members cast their ballots, out of 1,131 registered and 2,719 voters who were 18 years old. (A.R. at 375.) The Election Board's certification paperwork states that "over 38 percent of the eligible voters" participated, and the Department approved the result, noting that three people contested the election but did not state the reason. (*Id.* at 374–75.)

- In a 1975 election, the Election Board certification reflects that approximately 700 tribe members voted on two amendments, out of "1,641 members entitled to vote . . . in accordance with Section 16 of the [IRA]." (*Id.* at 364–67.) Neither the record nor the parties suggest the result was contested. (*Id.*)

4

- In a 1985 election approving an amendment, the Election Board certified that 408 voters out of 1,109 "entitled to vote cast their ballots in accordance with Section 16 of the [IRA]." (*Id.* at 354.) The Department approved the election results. (*Id.* at 352.) There is no indication that the results were challenged. (*Id.* at 352–354.)

- In a 1986 election, the Election Board certified that approximately 730 voters of 1,331 tribe members "entitled to vote . . . in accordance with Section 16 of the [IRA]" participated in the Secretarial election regarding several amendments. (*Id.* at 336, 340, 343, 347, 348, 350.) Again, the record does not indicate that anyone protested the election.

- In 2008, the Tribe held a Secretarial election on two amendments involving Tribal enrollment criteria in which approximately 960 out of 1,565 registered voters cast ballots. (*Id.* at 329.) The Election Board certified the results, stating the election satisfied the quorum results: "at least 30 percent of the 1565 members entitled to vote[] cast their Ballot in accordance with 25 CFR 81." (*Id.* at 330.) The Department's approval reiterated that the election satisfied the 30% quorum requirement "described in 25 CFR, Part 81." (*Id.* at 329.) The Department further determined that nine letters were submitted to challenge the election's result, but "none . . . had merit." (*Id.* at 327.) The basis for the challenges were not included in the record. (*See id.*) But after the election the Tribal Council held a referendum vote to reconsider the amendment "[d]ue to the low number of tribal members voting on the amendment." (*Id.* at 319–20.) The Tribal Business Council then asked the Secretary to hold another Secretarial election on the same issue to "ensure that the will of the eligible voters of the Tribes is pursued on an issue of such importance . . . ." (*Id.*)

- The second election was held in 2010 and the Election Board certified that the election satisfied the regulatory quorum requirement, stating that approximately 1,100 voters cast their ballot in "an election in which at least 30 percent of the 2,583 registered voters[] cast their ballot in accordance with 25 CFR 81." (*Id.* at 322–323.) The Department then approved the election, finding that it satisfied the quorum requirement in the IRA. (*Id.* at 317.) There is no evidence in the record that the election result was contested. (*Id.* at 316–386.)

While the Election Board certified and the Secretary approved each of these elections, they were all conducted under either the IRA or the 25 C.F.R. § 81 regulations. (*Id.* at 322–23, 330, 336, 340, 343, 347, 348, 350, 354, 364–67, 375.) There was no indication of any certification or approval under the Tribal Constitution itself. (*See id.*)

5

### C. 2013 Secretarial Election

On April 16, 2013, the Secretary authorized a Secretarial election, held on July 30, 2013. (*Id.* at 311.) The election proposed two amendments to the Tribal Constitution and bylaws: one to change the composition of the Tribal Business Council, (*Id.* at 132), and one to change the rules governing vacancies and removal from the Council, (*Id.* at 134–5).

The election packet sent by the Department for the 2013 Election stated the following regarding absentee voting: "A registered voter may vote by absentee ballot if they are unable to vote at the polling place because of temporary absence from the reservation, illness, or physical disability." (*Id.* at 137.) The election packet did not list living off the reservation as a valid reason for voting absentee. (*Id.*) Living off the reservation was, however, listed as a valid reason to vote absentee on the Absentee Ballot Request Form. (*Id.* at 139.)

At the time of the 2013 Election, 9,270 members of the Tribe were over age 18 (ECF No. 32 ("Am. Compl.") ¶ 30), and only 1,249 members were registered voters. (A.R. at 145.) Approximately 510 people voted, meeting the 30% registered-voter quorum (*Id.* at 145–46), but failing the voting-age quorum by nearly 25%, (Am. Compl. ¶ 34). Once again, the Tribal Business Council passed a resolution criticizing the election's low turnout: "The Tribal Business Council finds this to be a disproportionate number of the eligible voters of the Three Affiliated Tribes to adequately and fairly indicate the wishes of the enrolled membership." (ECF 1-4 ("2013 Resolution") at 1). The 2013 Resolution, which had the effect of formally requesting that the BIA decertify the 2013 election, was ultimately rejected by BIA Regional Director Weldon Loudermilk, who proceeded to formally approve the proposed Amendments and append them to the Tribal Constitution. (A.R. at 164–66.)

### D. Procedural History

On August 5, 2013, Hudson filed a challenge to the 2013 Election results with Secretarial Election Board Chairman Timothy LaPointe. (*Id.* at 142). Loudermilk rejected the challenge as untimely and lacking substantiating evidence (*id.* at 160–61), and Hudson timely appealed to the Interior Board of Indian Appeals ("IBIA"). *Hudson v. Great Plains Regional Director, Bureau of Indian Affairs*, 61 IBIA 253 (Sept. 15, 2015). The IBIA rejected the challenge and affirmed the Election on the ground that the challenge was "legally unsound" and lacked substantiating evidence. (A.R. at 2–3.)

On November 12, 2015, Hudson brought this suit challenging the IBIA's denial of his appeal of the decision to approve the 2013 Election. Hudson claims that approval was improper because: 1) an insufficient number of voters participated, so the election lacked the necessary 30% quorum under the IRA and the Tribal Constitution; and 2) the election packet contained incomplete information about absentee voting which discouraged members living off-reservation from voting. (Am. Compl. ¶ 1.)

The Department moved for voluntary remand on June 24, 2016, on the ground that it had identified "substantial and legitimate concerns" about the quorum calculation. The court granted the motion over Hudson's objection. (ECF No. 28 ("Dec. 2016 Order").) On February 24, 2017, the Department entered their notice of decision on remand. (ECF No. 30-1 ("Remand Decision").) The BIA addressed two questions on remand: 1) whether federal law requires 30% of all voting age members of the Three Affiliated Tribes as a quorum, as opposed to those registered to vote; and 2) whether the Tribe's Constitution provides a different standard for calculating a quorum. (Remand Decision at 1, 3.) On the first question, the BIA concluded that the 2013 Election was governed by 25 C.F.R. § 81, which requires only the participation of 30%

7

of registered voters. (Remand Decision at 1–3.) On the second question, the BIA found "no substantiating evidence" to show that the Tribal Constitution's quorum requirement in Article X had a different meaning from the regulation's. (Remand Decision at 3–4.) Accordingly, the BIA affirmed the decision to approve the 2013 Secretarial election. (Remand Decision at 1.) Hudson again moved for summary judgment and the Defendants cross-moved.

## II. LEGAL STANDARD

On a motion for summary judgment in a suit seeking APA review, the court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The court's review is "highly deferential" and begins with a presumption that the agency's actions are valid. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). The court is "not empowered to substitute its judgment for that of the agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but instead must consider only "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)).

An agency ruling that is contrary to law must be set aside. A court may invalidate an agency adjudication or rulemaking if it is "inconsistent with the statutory mandate or . . . frustrate[s] the policy that Congress sought to implement." *Illinois Commerce Comm'n v. ICC*, 749 F.2d 875, 880 (D.C. Cir. 1984) (quoting *Fed. Elec. Comm'n v. Democratic Senatorial Comm'n*, 454 U.S. 27, 39 (1981)). When an agency violates its regulations, it acts contrary to law. *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1010–11 (D.C. Cir.

2014). The plaintiff bears the burden of establishing the invalidity of the agency's action. *Id.*

### III. ANALYSIS

This case presents the court with some of the most fundamental aspects of our nation's democratic theory—those of "sovereignty and self-determination." *Ransom v. Babbitt*, 69 F. Supp. 2d 141, 154 (D.D.C. 1999). Courts must closely guard these values in the context of the United States' interactions with tribal governments. The fact that tribal self-government is at the pleasure of Congress, which has broad authority to regulate tribal affairs, is nonetheless informed by the "important backdrop" of "deeply engrained" ideas of tribal sovereignty "against which vague or ambiguous federal enactments must always be measured." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–43 (1980) (internal citation omitted). The Indian Reorganization Act, the statutory authority under which Defendants regulate Secretarial elections, was enacted to "establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1974). It is against this backdrop that this court considers Hudson's claims against the Department.

### A. <u>As-Applied Challenge under the Tribal Constitution's Quorum Requirement</u>

The Department concluded that the 2013 Election satisfied the Tribal Constitution's "entitled" voter quorum requirement based on its finding that 30% of "registered" voters participated. (Remand Decision at 1.) It contends that the Tribal Constitution's quorum requirement in Article X concurs with the regulatory requirement which calculates the quorum based on "registered" voters. (*Id.*; *see also* Def. Br. at 19–22.) Hudson argues that calculating the necessary quorum based on "registered" voters conflicts with the meaning of "entitled" in Article X, and therefore the 2013 Secretarial election failed to satisfy the quorum requirement

and is invalid. (ECF No. 35-1 ("Pl. Br.") at 25–33.) The court is hesitant to interpret another sovereign's constitution, especially on an issue of first impression. *Cf. Ransom*, 69 F. Supp. 2d at 150 ("[C]ourts take care not to intervene into internal tribal affairs."). But as the court cannot certify this question to a tribal court, as it otherwise may to a state supreme court, it is obligated to undertake the task.

The parties agree that under 25 C.F.R. § 81.2(b) the Tribal Constitution's procedures trump contrary BIA regulations. (Remand Decision at 3; Pl. Br. at 27.) The parties also agree that before 1967, "entitled to vote" meant the adult members of the Tribe, without any registration requirement. (Def. Br. at 20; Pl. Reply at 11) Despite their agreement on the original meaning, Defendants contend that, since ratification of the Tribal Constitution, the meaning of "entitled to vote" has changed, consistent with federal regulations, to mean that only those who have registered to vote are entitled to vote. (Remand Decision at 3–4.) The Remand Decision found that the constitutional provision was aligned with the regulatory definition because: 1) Article X's "entitled to vote" language changed meaning when the analogous regulation did so, and 2) the Tribe "acquiesced" to the regulatory meaning. (*Id.*) The court finds these arguments unavailing, unsupported by the record, and counter to the purpose of the Tribe's Constitution.

1. Regulation's Effect on the Constitution

In its initial decision, the IBIA found that Hudson had not provided sufficient evidence or legal argument to support his contention that the Tribal Constitution had a "different legal meaning of the term 'entitled to vote' than that established by Federal regulation." (A.R. at 9.) The IBIA, however, did not analyze the constitutional language. Therefore, the court granted Defendants' motion for remand in part so that the IBIA could do so. (Dec. 2016 Order at 9

(noting "[t]he BIA has at least more business than the district court interpreting the Tribal Constitution").) But once again, the BIA has failed to do. While the Remand Decision promised a "review of the language of the Tribal Constitution," (Remand Decision at 3) it included no analysis of the Tribal Constitution itself. Instead, it focused on the meaning of the analogous regulations. (*Id.*)

Essentially, the Remand Decision found that Article X's "entitled to vote" meant one thing (any adult member) when the Tribal Constitution was enacted in 1936, but it "evolved" and meant something else (members registered to vote) when the BIA promulgated regulations in 1967. (Remand Decision at 2–3.) While the Department appears to have backed away from this untenable argument in its briefing, (Def. Br. at 19–20), it was a basis of the underlying Remand Decision. (*See* Remand Decision at 3.) The BIA emphasized that there is "no substantiating evidence requiring us to find that the term "entitled to vote" in Article X (a term undefined in the Constitution) is a static term, with its application frozen in time based upon 1936 practices" and therefore the changed regulatory definition should also change the Tribal Constitution's definition of the same language. (Remand Decision at 3.) The Remand Decision further found it "notabl[e]" that "the Tribe has never sought Amendment of its Constitution to remove the registration requirement." (*Id.*)

But the BIA does not cite any authority for the proposition that its changing interpretation of its governing statute or regulations necessarily affects the meaning of a separate sovereign's identical constitutional language. Nor does it provide even a common-sense explanation as to why that might be true. Indeed, the reach of this argument is staggering; under the agency's reasoning, whenever the federal government amends regulations that address the same concerns as a tribe's constitution, it also amends the tribe's constitution. Moreover, the BIA's finding that

11

Article X was never amended to "remove the registration requirement" (*Id.* at 3) gets the amendment process backward: a federal regulation cannot amend a tribal constitution.

To accept the Remand Decision's proposition that the federal government's regulatory change amended the Tribe's Constitution would upend the self-rule principles at the heart of the Tribe's Constitution and the IRA. *Cf. Harjo v. Kleppe*, 420 F. Supp. 1110, 1146 (D.D.C. 1976), *aff'd sub nom.*, *Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978) (addressing a challenge to the federal government's recognition of governmental entities within the Creek Nation) ("[C]onsent for fundamental political decisions may only be obtained from the ultimate source of legislative authority, the people themselves."). Therefore, the court rejects Defendants' contention that the regulatory definition of one sovereign changes the meaning of a separate sovereign's governing document.

2. Tribal "Acquiescence"

The Department also contends that the Tribe "acquiesced" to the BIA's regulatory definition of "entitled" to vote by holding, certifying, and failing to protest elections under which the "registered" voter quorum requirement was implemented. (Remand Decision at 3–4.) BIA determined that because the Tribe's Election Board certified seven elections "based upon the federal standard of 30% of registered voters" the Tribe has interpreted its constitutional quorum requirement to require registration. (Remand Decision at 4; Def. Br. at 21–22.) On this basis, the BIA claims that it is deferring to the Tribe's interpretation of its Constitution when the BIA uses the "registered" voter definition for "entitled to vote." (Remand Decision at 4; Def. Br. at 21–22.) While this argument is stronger than the last, the court finds that the BIA disregarded the Tribe's limited statements about voter turnout, and the evidence that the Tribe used the

"registration" definition in some elections fails to overcome the conflict with the agreed-upon meaning of the Tribe's Constitution.

When reviewing the factual basis for an agency's determination, the court is "not empowered to substitute its judgment for that of the agency," *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416, but instead must consider "whether the facts on which the agency purports to have relied have some basis in the record . . . ." *Fulbright*, 67 F. Supp. 3d at 89 (quoting *Fund for Animals*, 903 F. Supp. at 105). Even applying this deferential standard, the court cannot find any basis in the record for the Department's conclusion that it must defer to the Tribe's authoritative interpretation of Article X.

The Department found that "the Tribe's consistent acceptance of the federal regulations' definition of 'entitled to vote' since 1967 is clear evidence that the Tribe interprets its law as consistent with the federal definition." (Remand Decision at 4.) While the Department is correct that the Tribe has certified election results based on a quorum of registered voters, the Tribe never referenced the constitutional provision in its certification; the quorum provision referenced was always the IRA or the regulation. (A.R. at 322–23, 330, 336, 340, 343, 347, 348, 350, 354, 364–67, 375.) In addition, there is a history of members of the Tribe protesting the results, although the record is not consistently clear regarding when elections were contested or on what grounds, as the record usually reflects only that a protest was made, or at best, includes the Department's brief response dismissing the complaint. (*Id.* at 329, 374.) Therefore, the record does not show that the Tribe's certifications represent their clear interpretation of Article X to include a registration requirement.

In addition, the record indicates the Tribe's concern with low turnout in Secretarial elections, which on at least one occasion resulted in a second election on the same issue. In

13

2008, the Tribe held a Secretarial election on two amendments regarding enrollment criteria in the Tribe. (A.R. at 329.) While the approval papers state that the election satisfied the regulatory 30% quorum requirement (*Id.*), the Tribal Council called for a referendum election on the amendment "[d]ue to the low number of tribal members voting on the amendment" in the Secretarial election, (*Id.* at 319). After the referendum, the Tribe requested another Secretarial election on the same issue to "ensure that the will of the eligible voters of the Tribes is pursued on an issue of such importance . . ." (*Id.*) Although that election was held and certified that the quorum was met based on registered voters, (*Id.* at 317), the Decision ignored this evidence of the Tribe's concerns with low turnout in Secretarial elections.

Most significantly, the Tribal Business Council, through its 2013 Resolution, asked the BIA "to decertify the July 30, 2013 Election Results due to a disproportionate number of eighteen years and older enrolled members of the Three Affiliated Tribes participating . . . ." (2013 Resolution at 1.) The Resolution may or may not have requested decertification for the same reason as Hudson argues, but the Tribe clearly signaled its unease with low turnout based on the *total* number of tribal members, not the number of registered members. The Department rejected the Tribe's request to decertify the results because the Secretarial election at issue "affected the representation power and authority of then-members of the Council." (Remand Decision at n.2.) Therefore, the Decision found that the views were not "dispositive" on the Tribe's interpretation of the quorum requirement. (*Id.*) It also noted that the Council did not "provide any definitive documentation of the Tribe's interpretation of the Constitutional provisions at issue." (*Id.*)

The Department improperly discounted the Tribe's views. And while the court agrees that the views of those with a vested interest in the outcome might not be entitled to great

14

deference, those views should not be discarded entirely when the Council previously expressed concern with low voter turnout for a vote on amending the Constitution. The Tribe's concerns, articulated in 2010 and in requesting decertification in 2013, are consistent with the purpose of the quorum requirement and IRA to ensure tribal members are "fully and fairly involve[d] . . . in the proceedings leading to constitutional reform." *California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1268 (D.C. Cir. 2008) (quoting *Morris v. Watt*, 640 F.2d 404, 414 (D.C. Cir. 1981)).

The court finds that the Tribe's stance on Article X appears to either be in favor of Hudson's reading or ambiguous, but either way far from an authoritative statement deserving of deference. The court would welcome an authoritative tribal interpretation of Article X in the interest of avoiding "disruption . . . of tribal sovereignty and self-determination," *Ransom*, 69 F. Supp. 2d at 151, but the Tribe has not provided one. Therefore, the court finds that the BIA's conclusion that the Tribe has provided an interpretation deserving of deference and has "acquiesced" to the registration requirement to be unsupported by the record.

Accordingly, the court finds that the agency's decision that Article X's meaning has "evolved over time" is unsupported by the record. Article X's quorum provision has been unchanged since its enactment and continues to require a 30% quorum of entitled voters—i.e., adult members of the tribe. Because the regulation requires a quorum of only registered voters, it contradicts the Tribe's constitutional provision and therefore the Tribal Constitution's quorum requirement applies. *See* 25 C.F.R. § 81.2(b). The court further finds that Defendants' certification of the 2013 Election based on a quorum of registered voters is contrary to law and a violation of the APA. *See Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1010–11 (holding that agency action violated the APA by being contrary to law because it was "plainly

contrary to the agency's own . . . rules"). Therefore, Defendants' approval of the 2013 Election must be vacated.

### B. <u>Other Challenges</u>

Having determined that Article X of the Tribal Constitution conflicts with the BIA's regulations, the court need not address whether Defendants' regulations in 25 C.F.R. § 81 are a reasonable interpretation of the IRA. The court declines to reach Hudson's facial challenge to the regulations in 25 C.F.R. § 81 or the question of whether the allegedly misleading ballot materials are also a basis for invalidating the election.

## IV. CONCLUSION

For the stated reasons, this court will GRANT Hudson's motion for summary judgment and DENY Defendants' motion for summary judgment. A corresponding Order will issue separately.

Date: April 10, 2020

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge